Filed 10/25/13  Jay A. Fishman, Ltd. v. Maloney CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT
## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| JAY A. FISHMAN, LTD., | D061589 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2011-00098994-CU-EN-CTL) |
| CATHERINE MALONEY, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Esteban Hernandez, Judge.  Affirmed.

David A. Kay for Defendant and Appellant.

The Guerrini Law Firm, John D. Guerrini; and David Brand for Plaintiff and Respondent.

Defendant and appellant Catherine Maloney appeals from an order denying her motion to vacate a Michigan judgment entered by plaintiff and respondent Jay A. Fishman, Ltd. (Fishman).  In making her motion, Maloney argued that the Michigan

court did not have personal jurisdiction over her. We affirm.

The record shows that Fishman provided investment advisory services to Maloney for almost 10 years from his location in Michigan. The services were provided under the terms of an agreement between Maloney and Fishman that expressly stated Fishman's services would be performed in Michigan and that any disputes would be governed by Michigan law. Given these circumstances, it was consistent with due process for the Michigan court to exercise personal jurisdiction over Maloney with respect to Fishman's claim for fees for services he performed in Michigan.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 28, 1998, Maloney executed an Investment Advisory Agreement (agreement) with Fishman, as well as a power of attorney. The agreement and power of attorney were signed by Maloney in California after Fishman personally solicited Maloney here in California.

The agreement authorized Fishman to manage Maloney's $16 million securities portfolio, which was maintained in Illinois. In pertinent part, the agreement provided: (1) all of Fishman's services would be performed in Michigan; (2) the agreement was not effective until Fishman agreed to it in writing; (3) Fishman would earn 0.50 percent of the portfolio's total market value each quarter and be paid in advance for services rendered; and (4) the agreement would be governed by the law of Michigan.

The agreement became effective on February 28, 1998, when Fishman signed it in Michigan. Maloney and Fishman maintained this business relationship for almost 10

2

years.  According to Fishman, over several years "[my company] managed Ms. Maloney's portfolio.  [My company's] employees, located in Michigan, conducted daily research as to market conditions and potential investment opportunities, and based on that research [my company] directed an extensive number of purchase and sale transactions for Ms. Maloney's portfolio.  With each transaction, a confirmation letter was sent from [my company] to Ms. Maloney, and there were on occasion phone calls with Ms. Maloney regarding the same."

In October of 2007, without notice to Fishman, Maloney transferred all of the portfolio's assets from the custodian to whom Fishman was authorized to direct purchases and sales to another custodian, with whom Fishman had no such authority.  The transfer effectively terminated the parties' agreement, even though Maloney did not provide Fishman with the 30-day notice required under the terms of their agreement.

According to Fishman, at the time the portfolio's assets were transferred, Maloney was owed him $131,315 in unpaid fees.  Following the transfer, Fishman attempted to contact Maloney, but she did not return telephone calls or written correspondence from him.

On February 14, 2011, Fishman filed a complaint in a Michigan circuit court against Maloney for the unpaid fees.

On July 27, 2011, after Maloney had been properly served with a summons and the complaint and had failed to respond by answer or otherwise, a default judgment was entered against her in the Michigan court in the amount of $131,640.

3

On October 5, 2011, Fishman filed an application for entry of the Michigan judgment in the trial court, and his application was granted on October 6, 2011.

On November 17, 2011, Maloney moved to vacate Fishman's Michigan judgment. The motion was supported by a memorandum of points and authorities and a declaration from Maloney.[1]  She argued that the Michigan court did not have personal jurisdiction over her.

Fishman opposed the motion and submitted a declaration setting forth the circumstances under which the agreement came about, was performed and was later terminated.

The trial court denied Maloney's motion with prejudice.

Maloney filed a timely notice of appeal.

DISCUSSION

I

A.  *Personal Jurisdiction and Minimum Contacts*

State courts may exercise personal jurisdiction over nonresident defendants who have been served with process only if those defendants have such minimum contacts with the state to ensure that the assertion of jurisdiction will not violate "'"traditional notions of fair play and substantial justice."'"  (*Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 568, citing *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14

---

[1]    Although Maloney's designation of record asked that her declaration be made part of the clerk's transcript, the declaration was not included in the clerk's transcript.  We grant her unopposed motion that the record be augmented with a copy of the declaration.

Cal.4th 434, 444-445, 474-475 (*Vons*).)  "'It is well-established that . . . ""random,"

"fortuitous," or "attenuated" contacts' do not support an exercise of personal jurisdiction.

[Citation.]  In analyzing such issues, the courts have rejected any use of "'talismanic

jurisdictional formulas.'"  [Citation.]  Rather, ""'the facts of each case must [always] be

weighed" in determining whether personal jurisdiction would comport with "fair play and

substantial justice."'  [Citation.]"  [Citation.]'  [Citation.]"  (*CenterPoint Energy, Inc. v.

Superior Court* (2007) 157 Cal.App.4th 1101, 1117.)

The due process clause protects an individual's liberty interest in not being subject

to the binding judgments of a forum with which he has established no meaningful

"contacts, ties, or relations."  (*International Shoe Co. v. Washington* (1945) 326 U.S. 310,

319.)  By requiring that individuals have "fair warning that a particular activity may

subject [them] to the jurisdiction of a foreign sovereign," (*Shaffer v. Heitner* (1977) 433

U.S. 186, 218 (conc. opn. of Stevens, J.)), the due process clause "gives a degree of

predictability to the legal system that allows potential defendants to structure their

primary conduct with some minimum assurance as to where that conduct will and will

not render them liable to suit" (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444

U.S. 286, 297).

B.  *Specific Jurisdiction*

Personal jurisdiction may be either general or specific.  (*Vons*, *supra*, 14 Cal.4th at

p. 445.)  Fishman does not contend Michigan had general jurisdiction over Maloney but

contends that, with respect to her obligations to him, Michigan may exercise specific

5

jurisdiction.

Where, as here, it is asserted a forum has specific jurisdiction over an out-of-state defendant who has not consented to suit there, the due process clause's fair warning requirement is satisfied if the defendant has "'purposefully directed'" his activities at residents of the forum (*Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770, 774), the litigation results from alleged injuries that "arise out of or relate to" those activities (*Helicopteros Nacionales de Colombia v. Hall* (1984) 466 U.S. 408, 414), and "'the assertion of personal jurisdiction would comport with "fair play and substantial justice"'" (*Vons*, *supra*, 14 Cal.4th at p. 447).

The requirement that a defendant purposefully direct his or her activities at the forum, or as it is sometimes articulated, purposefully avails himself or herself of the benefits and protections of the forum, "'focuses on the defendant's intentionality.'" (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269.) Courts look to the "nature and quality of the activity in the forum state" and not to the quantity of a defendant's contacts when determining whether a defendant is subject to specific jurisdiction in a forum. (*As You Sow v. Crawford Laboratories, Inc.* (1996) 50 Cal.App.4th 1859, 1869; see also *World-Wide Volkswagen Corp. v. Woodson*, *supra*, 444 U.S. at p. 297 [whether a nonresident defendant purposefully availed himself or herself of the benefits and protections of the forum state is evaluated by whether "the defendant's conduct and connection with the forum State are such that he [or she] should reasonably anticipate being haled into court there"].) Once satisfied, this prong ensures a defendant will not be

6

required to defend himself or herself in a jurisdiction by reason of "'random,' 'fortuitous,' or 'attenuated contacts'" in that forum. (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 475 (*Burger King Corp*.).)

C. *Commercial and Contractual Activities*

"[W]ith respect to interstate contractual obligations, we have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." (*Burger King Corp.*, *supra*, 471 U.S. at p. 473; see *Travelers Health Ass'n v. Virginia* (1950) 339 U.S. 643, 647; *McGee v. International Life Insurance Co.* (1957) 355 U.S. 220, 222-223.)

On the other hand, "[i]f the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot. The Court long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests, [citation], or on 'conceptualistic . . . theories of the place of contracting or of performance,' [citation]. Instead, we have emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' [Citations.] It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant

7

purposefully established minimum contacts within the forum." (*Burger King Corp.*, *supra*, 471 U.S. at pp. 478-479.)

D. *Burden of Proof and Standard of Review*

Although when jurisdiction is challenged the defendant is the moving party, the plaintiff must carry the initial burden of demonstrating facts by a preponderance of evidence justifying the exercise of jurisdiction by the forum. (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 110 (*Automobile Antitrust Cases*).) Importantly, the plaintiff must do more than merely allege jurisdictional facts. The plaintiff must present evidence sufficient to justify a finding that the forum may properly exercise jurisdiction over the defendant. (See *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 540.) "The plaintiff must provide affidavits and other authenticated documents in order to demonstrate competent evidence of jurisdictional facts. Allegations in an unverified complaint are insufficient to satisfy this burden of proof. Declarations cannot be mere vague assertions of ultimate facts, but must offer specific evidentiary facts permitting a court to form an independent conclusion on the issue of jurisdiction. [Citations.] Once the plaintiff satisfies the initial burden of proof of showing a defendant's minimum contacts in [the forum], the burden shifts to the defendant to present a compelling case demonstrating that the exercise of jurisdiction by [the forum's] courts would be unreasonable. [Citations.]" (*Automobile Antitrust Cases*, *supra*, at pp. 110-111.)

"When the trial court rules after hearing conflicting evidence on a factual issue, we

8

must uphold its factual determinations on appeal if substantial evidence supports them. When the facts are undisputed, the issue of jurisdiction becomes a pure question of law." (*Automobile Antitrust Cases*, *supra*, 135 Cal.App.4th at p. 111.)  The ultimate question of whether it is fair and reasonable for the forum to exercise jurisdiction is a legal determination subject to our independent review on appeal.  (*Ibid*.)

III

ANALYSIS

Three facts, which Maloney does not dispute, fully and adequately support Michigan's jurisdiction over her with respect to Fishman's claim: (1) there is no dispute that in light of paragraph 9 of the parties' agreement, Maloney knew Fishman would be performing services for her in Michigan; (2) there is no dispute the parties agreement also provided that all disputes would be governed by Michigan law; and (3) there is no dispute that, as set forth in Fishman's declaration, Fishman, as well as his employees, in fact provided those services to Maloney for almost 10 years in Michigan and that Maloney was in regular communication with Fishman and his employees during that period while they were in Michigan.  Thus, the record shows not only that Maloney had fair notice that activities would be taking place on her behalf in Michigan and that any disputes would be governed by Michigan law, but also that the Michigan activities were substantial and long enduring.  Under the holding in *Burger King Corp.*, *supra*, these circumstances fully support the validity of the Michigan judgment.

In *Burger King Corp.*, the defendant was the Michigan franchisee of a Florida

9

corporation whose principal offices were in Miami. When the franchisee fell behind in making payments to the corporation and refused to vacate the franchise location, the corporation sued the franchisee in Florida under the terms of the parties' 20-year franchise agreement, which, among other matters, provided that the corporation's operations were conducted in Miami and disputes would be governed by Florida law. The court found that the lengthy relationship contemplated by the franchise agreement, the agreement's reference to the corporation's Florida operations and Florida law, as well as the parties' actual course of business, which involved regular communication between the Michigan franchisee and the corporation's Miami office, made it presumptively reasonable for a Florida court to resolve the corporation's claims. (*Burger King Corp.*, *supra*, 471 U.S. at pp. 480-483.)

The court relied in particular on the "substantial record evidence indicating that [the franchisee] most certainly knew that he was affiliating himself with an enterprise based primarily in Florida" as well the franchisee's agreement to be bound by Florida law. (*Burger King Corp.*, *supra*, 471 U.S. at p. 480.) The choice of law provision, while not sufficient by itself to sustain jurisdiction, when combined with the franchisee's lengthy relationship with the Florida corporation, reinforced the franchisee's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." (*Id*. at p. 482.)

The court further found that Florida had a legitimate interest in the dispute and that any inconvenience the franchisee endured by virtue of litigating the claim was not

10

sufficient to deprive the Florida court of jurisdiction.  (*Burger King Corp.*, *supra*, 471 U.S. at pp. 482-484.)

Here, the record is, in material respects, indistinguishable from *Burger King Corp.* Maloney entered into a substantial contract with a Michigan resident knowing his services and the services of his employees would be provided in Michigan; she agreed their disputes would be resolved under Michigan law, and she maintained that relationship for a substantial period of time.  These circumstances show that, like the franchisee in *Burger King Corp.*, Maloney purposely availed herself of the benefits and protections of Michigan's laws and therefore could reasonably foresee the possibility she would be compelled to litigate her claims there.

Moreover, Michigan had substantial legitimate interests in holding Maloney accountable in its courts.  The amount in dispute was substantial and implicated not only Fishman's interests but the interests of his employees.

In sum, the trial court did not err in denying Maloney's motion.

The trial court's order is affirmed.  Cost of appeal are awarded to Fishman.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

HALLER, J.

11